**ATLANTIC PRINCE, LTD., Plaintiff,**

v.

**Thomas C. JORLING, Commissioner of the New York State Department of Environmental Conservation, and The New York State Department of Environmental Conservation, Defendants.**

**No. 88 Civ. 1803.**

United States District Court,
E.D. New York.

April 12, 1989.

As Amended April 14, 1989.

Richard Schoolman, Eikenberry Futterman & Herbert, New York City, for plaintiff.

Ezra I. Bialik and Helene Goldberger, Asst. Attys. Gen., Environmental Protection Bureau, New York City, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff seeks an order declaring that a New York statute prohibiting the use of boats longer than 90 feet from fishing in New York waters violates the Commerce Clause, Art. I, § 8, cl. 3 of the United States Constitution, and permanently enjoining the State from enforcing the statute against it. The case has been fully tried on the merits.[1] For the reasons stated below, the court finds in favor of plaintiff and grants the requested relief.

### Introductory Facts

N.Y. Envtl.Conserv.Law § 13-0349 (McKinney 1984 & Supp.1988) (hereinafter "§ 13-0349") reads in relevant part as follows:

> No person shall take food fish, shellfish, or crustacea from the waters of the marine and coastal district for commercial purposes using a commercial fishing vessel longer than ninety feet in registered length.

Plaintiff, a partnership based in Cape May, New Jersey, owns and operates the Atlantic Prince, a 132-foot commercial fishing vessel outfitted for catching, freezing and packaging squid. Complaint ¶ 2; Tr1. 19.[2]

New York's Department of Environmental Conservation ("DEC") erroneously issued the Atlantic Prince fishing permits in 1987 and 1988, even though the vessel exceeded the 90-foot limit set forth in § 13-0349. In May, 1988, however, DEC agents boarded the vessel and told its captain that it must leave New York's waters.[3]

---

1. On June 9, 1988, following a hearing, the court granted plaintiff's request for a temporary restraining order. On June 20, 1988, following a second hearing, the court granted plaintiff's request for a preliminary injunction. The trial was held on March 6, 1989. The court's findings of fact in this opinion are based upon the record of these three hearings. Throughout this opinion, citations to the June 9 hearing transcript are designated "Tr1. ____." Citations to the June 20 hearing transcript are designated "Tr2. ____." Citations to the March 6 trial transcript are designated "Tr3. ____."

2. The Atlantic Prince "targets" two species of squid—illex and loligo—about 80 to 90 percent of the time. Ten or 15 percent of the time it targets mackerel. Small quantities of other fish—known as "by-catch"—get caught in its nets incidentally. Tr3. 25-27.

3. The "marine and coastal district" in which the 90-foot limit applies "shall include the waters of the Atlantic Ocean within three nautical miles from the coast line and all other tidal waters within the state, including the Hudson River up to the Tappan Zee bridge." N.Y. Envtl.Conserv.Law § 13-0103 (McKinney 1984).

The DEC subsequently revoked the permit and warned plaintiff that the Atlantic Prince could not fish in New York waters. Complaint Exhs. A and B.

Plaintiff brought this action on June 9, 1988, alleging that § 13–0349 violates the "dormant Commerce Clause" because it was enacted to protect New York commercial fishers from out-of-state competitors. Plaintiff alleged that New York commercial fishers use boats less than 90 feet long, so that a ban on longer boats affects only out-of-state fishers, such as plaintiff.

The state maintains that the statute is not discriminatory because it prohibits *all* commercial fishers, regardless of state origin, from using boats over 90 feet long to catch food fish in New York waters. The state also asserts that the statute is valid because any burden it places on interstate commerce is not "clearly excessive" in comparison with the legitimate state purpose of protecting the environment.

### DISCUSSION

The Commerce Clause of the Constitution grants Congress the power "[t]o regulate Commerce ... among the several States[.]" Art. I, § 8, cl. 3. "Although the Clause thus speaks in terms of powers bestowed upon Congress, the Court long has recognized that it also limits the power of the States to erect barriers against interstate trade." *Maine v. Taylor*, 477 U.S. 131, 137, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986) (quoting *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980)).[4]

This "dormant" Commerce Clause doctrine is based upon "the principle that one state in its dealings with another may not place itself in a position of economic isolation." *Philadelphia v. New Jersey*, 437 U.S. 617, 623, 98 S.Ct. 2531, 2535, 57 L.Ed. 2d 475 (1978) (quoting *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 537–38, 69 S.Ct. 657, 664–65, 93 L.Ed. 865 (1949) (quoting in turn *Baldwin v. Seeley*, 294 U.S. 511, 527, 55 S.Ct. 497, 502, 79 L.Ed. 1032 (1935))).

Modern Supreme Court opinions elaborating upon the dormant Commerce Clause have distinguished between two broad types of state-imposed barriers to trade: nondiscriminatory state statutes which burden interstate commerce only incidentally, and state statutes which affirmatively discriminate against interstate commerce, either on their face or in "practical effect." *Id.*, 106 S.Ct. at 2447–48 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979)).

Nondiscriminatory statutes "violate the Commerce Clause only if the burdens they impose on interstate trade are 'clearly excessive in relation to the putative local benefits[.]'" *Id.*, 106 S.Ct. at 2448 (quoting *Pike v. Bruch Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)).

Where a statute is found to be discriminatory, however, the burden of persuasion shifts to the State to demonstrate "both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Id.* (quoting *Hughes*, 441 U.S. at 336, 99 S.Ct. at 1736).

Thus, to determine which test applies, the court first must determine whether or not § 13–0349 is discriminatory.

### *Discriminatory Effect*

 While the statute clearly is neutral on its face, the court finds, as a factual

---

4. Justice Holmes once wrote that judicial review under the dormant Commerce Clause may be more important to national survival than the power to invalidate Acts of Congress:

> I do not think the United States would come to an end if we lost our power to declare an Act of Congress void. I do think the Union would be imperiled if we could not make that declaration as to the laws of the several States. For one in my place sees how often a local policy prevails with those who are not trained to national views and how often action is taken that embodies what the Commerce Clause was meant to end.

O. Holmes, "Law and the Court," in *Collected Legal Papers* 291, 295–96 (1920) (quoted in Brown, "The Open Economy: Justice Frankfurter and the Position of the Judiciary," 67 *Yale L.J.* 219, 219 (1957)).

matter, that it is discriminatory "in practical effect." *Id.*

Even facially neutral statutory provisions can be discriminatory "in practical effect." In *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), the Supreme Court struck down a Hawaii statute exempting certain locally-produced alcoholic beverages from a 20% excise tax on wholesale liquor sales. The majority found the effect of the exemption to be "clearly discriminatory," *id.,* 468 U.S. at 271, 104 S.Ct. at 3055, despite the fact that the out-of-state plaintiffs were "free to take advantage of the benefit of the exemption by selling the exempted products themselves." *Id.,* 468 U.S. at 278, 104 S.Ct. at 3058 (Stevens, J., dissenting). Similarly, § 13–0349 is "clearly discriminatory," even though out-of-state fishers are "free" to avoid the statute's burden by using the same size of vessel as their in-state competitors.

In *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Court struck down a North Carolina statute requiring all apples sold in closed containers in North Carolina to bear a U.S.D.A. quality grade—which happened to be the grading system already used by the North Carolina apple industry—and prohibiting the use of any other type of grade. The stat-

ute had forced the Washington apple industry to abandon a superior system of grading apples when selling its product in North Carolina. As in the instant case, the state defended its statute as being "evenhanded" because it applied to all apples sold in closed containers in North Carolina, regardless of their point of origin. *Id.,* 432 U.S. at 349, 97 S.Ct. at 2444. However, the Court found the statute discriminatory because it only raised the cost of doing business for out-of-state businesses which did not use the U.S.D.A. grading system. *Id.,* 432 U.S. at 350–51, 97 S.Ct. at 2445–46.[5] Similarly, § 13–0349 discriminates against out-of-state businesses even though it is "evenhanded" on its face. *See also Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 446–47, 98 S.Ct. 787, 796–97, 54 L.Ed.2d 664 (1978) (statutory exemptions to state ban on overlength trucks, although facially neutral, "primarily benefited" local industries).[6]

Here, the evidence bears out plaintiff's assertion that the statute is discriminatory because it "bears disproportionately"—in fact, almost exclusively—on out-of-state fishers. *See Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 675–76, 101 S.Ct. 1309, 1318–19, 67 L.Ed.2d 580 (1981) (judicial deference to state legislature reduced where local regulation "bears disproportionately" on out-of-state residents and businesses).

---

**5.** The court also found it "somewhat suspect" that the state singled out only closed containers of apples, "the very means by which apples are transported in interstate commerce[.]" *Id.,* 432 U.S. at 352, 97 S.Ct. at 2446.

**6.** Defendants rely on *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed. 2d 91 (1978) in arguing that § 13–0349 is not discriminatory. In that case the Court upheld a state statute barring petroleum producers and refiners—all of which were interstate businesses —from operating retail services within Maryland. However, as explained in *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980), the Court in *Exxon* found that the statute "could not discriminate against interstate petroleum producers and refiners in favor of locally based competitors because, as a matter of fact, there were no such local producers or refiners to be favored." *Id.,* 447 U.S. at 40–41, 100 S.Ct. at 2017–2018. The Court "also rejected a claim of discrimination at

the retail level because the statute placed 'no barriers whatsoever' on competition in local markets by 'interstate independent dealers' that did not own production or refining facilities.'" *Id.* (quoting *Exxon,* 437 U.S. at 126, 98 S.Ct. at 2214). The Court found that "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another"—*i.e.,* from interstate petroleum refiners and producers to interstate independent dealers. *Exxon,* 437 U.S. at 127, 98 S.Ct. at 2214.

This case, in contrast, does not involve "an otherwise valid regulation" that causes some purchasers of fish to shift their business from one set of out-of-state fishers to another. This statute burdens *all* out-of-state fishers to the extent that they employ larger vessels than the ones used by New York fishers. Moreover, in this case there certainly are "local producers ... to be favored" by the 90–foot limit. Thus, this case bears no resemblance to *Exxon.*

At the time § 13–0349 was enacted in July 1986, there was, at most, only one New York commercial fishing vessel exceeding 90 feet in length. Tr2. 11, 29.[7] In contrast, this year the DEC has received license applications for New York fishing licenses from ten out-of-state vessels over 90 feet in length (including plaintiff's). Tr3. 49.

Those who advocated passage of the bill which became § 13–0349 knew that it discriminated against out-of-state fishers. In testimony submitted to the State Senate Subcommittee on the Long Island Marine District on January 25, 1986, the DEC stated that its support for the bill stemmed from its "concern[ ] about the growth in the number and harvesting power of *non-resident* fishing vessels" in New York waters. The DEC believed that these non-resident fishing vessels were exacerbating "user conflicts" in New York waters, and that "[a] maximum length limit on fishing vessels is one of a number of measures we believe appropriate and necessary to address this problem." Defendants' Exhibit ("DX") N, at pp. 6–7 (emphasis added). The DEC also stated that a provision of the

bill defining "squid" as "food fish"—thus bringing squid boats within the 90–foot limit—would "eliminate a loophole in the current licensing requirement on *non-resident* fishing vessels using New York's waters." *Id.* (emphasis added).[8]

A March 18, 1986 internal DEC memorandum setting forth DEC's position on the bill was equally explicit about the bill's discriminatory impact, stating that "[e]nactment of the measure is critical to the Department's efforts to control increases in *non-resident* fishing vessels entering New York's territorial sea and internal waters." Plaintiff's Exhibit ("PX") 3 (emphasis added).

Most tellingly, in a July 1, 1986 letter recommending that the Governor sign the bill, State Assemblyman John L. Behan advised the Governor's legislative liaison that "[p]resently, there are no vessels of 90 feet or more in registered length operated by New York State commercial fisherman [sic] and, therefore, *this bill would not present a problem for New York residents.*" Joint Exhibit ("JX") 1 (emphasis added).[9]

---

7. Currently, licensed squid boats in New York average 40 to 65 feet in length. Tr3. 66.

8. DEC's complete statement regarding the bill was as follows:

5. S.5459 (1985) A bill to prohibit the taking of marine food fish by vessels greater than 90 feet in length and defining squid as food fish.

The Department strongly supports this bill. For reasons that will be more fully developed later in our testimony, we are concerned about the growth in the number and harvesting power of non-resident fishing vessels in New York's territorial sea and internal waters. Entry into state waters by large offshore fishing vessels displaced from less productive fisheries on George's Bank or of new, large domestic freezer trawlers currently entering the northwest Atlantic fishery will greatly exacerbate user conflicts presently being experienced in New York. A maximum length limit on fishing vessels is one of a number of measures we believe appropriate and necessary to address this problem.

The definition of squid as "food fish" will eliminate a loophole in the current licensing requirement on non-resident fishing vessels using New York's waters. This measure has been proposed by the Department in past years and we believe it requires urgent consideration.

DX N at pp. 6–7.

9. The letter, addressed to the Hon. Evan A. Davis in the Executive Chamber of the State Capitol, reads:

Dear Mr. Davis:

Assembly bill A.9088/S.5459 has been passed by both houses of the Legislature and will be before the Governor for executive action.

I strongly urge the Governor to sign this bill into law. This legislation, which amends the Environmental Conservation Law, in relation to squid and commercial fishing, provides important provisions for the protection of the commercial fishing industry.

The specific provisions include:

a) a provision incorporating squid into the definition of "food fish" as contained in section 11–0103 of the Environmental Conservation Law. This will provide additional protections under Article 11, the Fish and Wildlife Law, regulating the taking of squid by foreign and out of state commercial fishing vessels. This will provide New York commercial fisherman [sic] with the statutory protection to compete with subsidized foreign fleets.

b) a provision limiting vessels in excess of 90 feet in registered length from engaging in commercial fishing in New York State waters. This section is specifically intended to limit large foreign vessels equipped with processing

*Legitimate Local Purpose/Other
Nondiscriminatory Means*

Because the statute clearly is discriminatory in practical effect, it becomes the State's burden to demonstrate that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means. *Taylor*, 477 U.S. at 138, 106 S.Ct. at 2448. Here, the State contends that § 13–0349 is the only practical means of furthering a number of environmental goals.

However, this court is required to assess such contentions skeptically. "[W]hen considering the purpose of a challenged statute, [the court] is not bound by '[t]he name, description or characterization given it by the legislature or the courts of the State,'

but will determine for itself the practical impact of the law." *Hughes*, 441 U.S. at 336, 99 S.Ct. at 1736 (quoting *Lacoste v. Louisiana Department of Conservation*, 263 U.S. 545, 550, 44 S.Ct. 186, 188, 68 L.Ed. 437 (1924)). *See also Dean Milk Co. v. Madison*, 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951) (taking proffered justification at face value would vitiate the Commerce Clause "save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods"); *Taylor*, 477 U.S. at 149, 106 S.Ct. at 2454 (asserted local purpose cannot be merely "a sham or a '*post hoc* rationalization'"; quoting *Hughes*, 441 U.S. at 338 n. 20, 99 S.Ct. at 1737 n. 20; *Consolidated Freightways Corp.*, 450 U.S. at 680, 101 S.Ct. at 1321 (Brennan, J., con-

equipment. At this time, foreign fleets are preparing to introduce into New York State waters vessels in excess of 90 feet with freezer-processor capabilities. Such vessels will create an imbalance in the state's fishery and provide foreign fleets with an unfair advantage over the state's commercial fishing industry.

These vessels, with their ability to enter state waters and process fish on-board will also be able to easily circumvent state laws with respect to closed and limited fisheries, harvesting such species from state waters for sale in other states with different laws relating to sale.

Presently, there are no vessels of 90 feet or more in registered length operated by New York State commercial fisherman [sic] and, therefore, this bill would not present a problem for New York residents.

In light of the recent closing of the striped bass fishery, the major portion of many commercial fisherman's [sic] income, we must do all we can to ensure the continuation of our state's commercial fishery. It is both and [sic] economic and historical resource that we can ill afford to lose. I hope that the Governor will recognize the importance of these measures to the continued survival of the commercial fishing industry and approve this legislation.

 Sincerely,
 John L. Behan
 Member of Assembly

Over the last several years, a trawl fishery for squid has developed in New York's Marine and Coastal District. Squid, used as human food, is being landed at Montauk, Shinnecock, Sayville and New York City. Approximately 5 million pounds of squid, valued at $1.6 million, are being landed annually. Obviously,

squid has gained prominence as a valuable marine resource in New York State.

Yet, until squid is included within the definition of food fish there are no regulations governing this fishery. This bill also requires non-resident trawlers to obtain the non-resident food fish license required by ECL § 13–0335. Requiring non-resident squid fishermen to obtain this license will aid efforts to conserve this resource.

In addition, there is great concern about the growth in the number and harvesting power of *non-resident* fishing vessels in New York's territorial sea and internal waters. Entry into state waters by large offshore fishing vessels displaced from less productive fisheries on George's Bank or of new, large domestic freezer trawlers currently entering the northwest Atlantic fishery will exacerbate user conflicts presently being experienced in New York. A maximum length limit on fishing vessels is one of a number of measures we believe appropriate and necessary to address this problem. *The proposed 90 foot limit is appropriate as it does not include any local New York fishing vessels so [it] will not impact New York's industry although it will be a measure applied to the entire fishery.*

*Recommended Position Statement:* The Division of Marine Resources strongly recommends passage of this legislation amending the ECL to include squid as a food fish and control commercial fishing by large vessels. Our waters are a rich area for squid which presently is exempt from any consideration in the ECL and has needed to be included for several years. In addition, all our resources need protection from the introduction of more powerful and environmentally damaging gear.

PX 2 (emphasis added).

curring in judgment) ("The burdens imposed on commerce must be balanced against the local benefits actually sought to be achieved by the State's lawmakers, and not against those suggested after the fact by counsel"); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 522, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935) (state may not burden interstate commerce "under any guise"; quoting *International Textbook Co. v. Pigg*, 217 U.S. 91, 112, 30 S.Ct. 481, 487, 54 L.Ed. 678 (1910)); *New Energy Co. v. Limbach*, 486 U.S. 269, 108 S.Ct. 1803, 1811, 100 L.Ed.2d 302 (1988) ("implausible speculation" not a sufficient local purpose); *W.C.M. Window Co. v. Bernardi*, 730 F.2d 486, 496 (7th Cir.1984) (state cannot justify statute as addressing "purely conjectural harms").[10]

The court recognizes that states have a strong and legitimate interest in conserving and safeguarding their natural resources, even where an alleged environmental risk is "imperfectly understood" and "may ultimately prove to be negligible." *Taylor*, 477 U.S. at 148, 106 S.Ct. at 2453 (upholding ban on imported baitfish where adequate nondiscriminatory means were unavailable).

Nevertheless, even a statute purportedly motivated by environmental concerns must withstand "strict scrutiny" if it discriminates, on its face or in practical effect, against out-of-state residents or producers. *Taylor*, 477 U.S. at 144, 106 S.Ct. at 2451; *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 957–58, 102 S.Ct. 3456, 3464–65, 73 L.Ed.2d 1254 (1982) (invalidating statute limiting interstate transfers of ground water to states which granted reciprocal water transfer rights). The State must demonstrate that the statute is "narrowly tai-

lored to the conservation and preservation rationale." *Id.* Where the State fails to demonstrate the existence of a "close means-end relationship," the statute will be struck down. *Id. See also Philadelphia v. New Jersey*, 437 U.S. 617, 629, 98 S.Ct. 2531, 2538, 57 L.Ed.2d 475 (1978) (invalidating ban on importing waste into New Jersey landfills where there was "no basis to distinguish out-of-state waste from domestic waste"); *Hughes*, 441 U.S. at 338, 99 S.Ct. at 1737 (invalidating state ban on exporting minnows because it was "certainly not a 'last ditch' attempt at conservation after nondiscriminatory alternatives had proven unfeasible.").

■ Here, the State has failed utterly to meet its burden of proving that the 90–foot limit was motivated by or rationally served any alleged environmental concerns. Each of its contentions on this point is unsupported by the evidence:

1) The State argues that the statute conserves fish by excluding vessels with "excess" fishing capacity. Defendants' Trial Memorandum ["Def.Mem."] at 13. According to the State's expert witness, John M. Mason, a marine biologist employed by the DEC,[11] vessels longer than 90 feet have the capacity to catch far greater amounts of fish in a given period of time due to their greater horsepower and larger nets. Tr2. 13. However, testimony showed that there is no shortage of squid in New York waters, Tr2. 36–38, 46, and that, in any event, New York has imposed no numerical limit on the number of fishing licenses it will grant to fishing vessels less than 90 feet long. Tr3. 66–69; Tr2. 12, 30.[12] Since two 90–foot boats can catch as much fish in a given period of time as one boat the size of

---

**10.** One commentator has suggested that dormant Commerce Clause claims should turn entirely upon whether or not the legislature was actually motivated by economic protectionism in enacting any portion of the challenged statute. Regan, "The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause," 84 *Mich.L.Rev.* 1091, 1148 (1986) (hereinafter "Regan, 'Dormant Commerce Clause' ").

**11.** Mr. Mason was qualified as an expert witness on the subjects of marine biology and fishery

management. Tr2. 7–9. He was not qualified as an expert on commercial fishing, and his opinions on commercial fishing are not entitled to great weight, if any. However, the court would reach the same conclusions even if it considered Mr. Mason qualified to give expert testimony on commercial fishing.

**12.** In 1988, New York issued 83 nonresident fishing licenses. The only applicant denied such a license was the Atlantic Prince. Tr2. 12.

the Atlantic Prince, Tr2. 40,[13] and since there is no limit on the number of 90–foot boats allowed to fish in New York waters, the 90–foot limit clearly does not serve the "legitimate local purpose" of conserving squid. *See Hughes,* 441 U.S. at 338, 99 S.Ct. at 1737 (state ban on exporting minnows could not be justified as conservation measure where the state placed "no limits on the numbers of minnows that [could] be taken by licensed minnow dealers").

2) The State, having virtually conceded that the 90–foot limit is not intended to conserve squid,[14] contends that the limit is meant to protect certain types of less abundant fish—such as winter flounder, summer flounder and scup—which are swept up inadvertently in the nets of large fishing vessels. Def.Mem. at 13; Tr2. 14–17. (Such accidentally-caught fish are known as "by-catch.")

The State claims that the 90–foot limit was enacted in order to avoid overfishing of these species, which are already "fully utilized"—meaning that they are being caught at a rate which cannot be increased without causing their population to decline. Tr2. at 16–17.[15] However, the State failed to present any evidence that the larger vessels excluded by the 90–foot limit pull in a higher proportion of accidental "by-catch" relative to "targeted" catch. Tr2. 30–31. *See* n. 2, *supra.* Since, as noted above, the State imposes no numerical limit on small fishing vessels, and since there is no evidence to suggest that larger vessels catch a higher proportion of by-catch, the 90–foot limit does not promote conservation of "fully-utilized" fish species.

3) The State contends that nonresident vessels could catch undersized fish in New York waters and resell them in states which do not restrict the sale of such fish. Tr2. 25–26, 34; *see also* Assemblyman Behan's letter, JX 1, ¶ 6, reproduced at n. 9, *supra.* However, Mr. Mason testified that the "vast majority" of the "by-catch" dies

before it is thrown back into the ocean. Tr2. 16. If it is futile to throw fish back once they are caught, then it is unclear how New York's limitations on fish size could promote conservation of undersized fish. The State offered no explanation of this. Furthermore, Mr. Mason testified that, while he did not know the mesh size of the squid nets used by the Atlantic Prince, he assumed that it was the same as the mesh size used by New York squid vessels—approximately two inches in diameter. Tr2. 15–16. Therefore, there is no reason to believe that vessels like the Atlantic Prince are more likely than smaller New York vessels to catch undersized "by-catch."

In short, the State's evidence did not establish any rational connection between the 90–foot limit and enforcement of New York's fish size limitations. This simply cannot be the statute's "legitimate local purpose."

4) The State argues that large fishing vessels crowd out smaller commercial and recreational vessels. Def.Mem. at 14; Tr2. 17–18. Again, the State has failed to explain why it is concerned about crowding caused by boats longer than 90 feet, but can tolerate the presence of an unlimited number of smaller vessels in New York waters. *See* Tr3. 71.

5) The State asserts that larger boats can operate in worse weather. Mr. Mason's testimony touched on this only briefly, Tr2. 17, and no other evidence was adduced in support of it. The unstated premise of this argument is that large vessels will go out fishing a greater percentage of the time, possibly leading to overfishing. Again, the State's concern about excessive fishing appears vastly overstated in light of its failure to limit the number of smaller boats which catch the same types of fish.

---

**13.** Moreover, in shallow water, large and small vessels catch approximately equal amounts of squid. Tr3. 70.

**14.** *See* Tr2. 36, 38, 56–57.

**15.** Mr. Mason testified that fishing of these species has reached "maximum sustainable yield," which means that the rate at which these fish are lost through fishing equals the rate at which they reproduce themselves. Tr2. 17.

6) Finally, the State argues that the larger nets used by boats longer than 90 feet cause significantly more environmental damage than the nets used by smaller boats.

The trawling nets used by the Atlantic Prince are held open by rectangular metal "doors" measuring approximately thirteen feet by six feet. The nets used by smaller boats are held open by smaller metal doors measuring about eleven feet by five-and-a-half feet. Tr2. 50. The larger net doors of the Atlantic Prince weigh about twice as much as those used by the smaller vessels. Tr3. 45.

Mr. Mason testified that the larger, heavier doors dig up the sea bottom, killing shell fish and lobsters, and throw up a cloud of sediment which could drive other fish species away from the area. Mr. Mason also stated that, if large-doored nets were used at certain times of the year, the sediment cloud they create could alter the spawning and migration patterns of certain fish species. Tr3. 46, 51. In contrast, smaller net doors cause less damage and present fewer environmental risks because they tend to bounce along the sea bottom when being pulled. *Id.*

However, on cross-examination, Mr. Mason conceded that larger vessels can pull their trawling nets quickly enough to make their larger net doors bounce along the bottom in a manner similar to smaller net doors. Tr3. 54. The state submitted no evidence regarding the trawling speeds actually attained by the Atlantic Prince and other vessels of its type. Mr. Mason testified that he had never visited the Atlantic Prince while it was trawling, and stated that the DEC does not regulate trawling speed. *Id.* The State also offered no evidence as to whether smaller net doors also dig up the sea bottom when pulled slowly.[16]

The foregoing evidence, in the court's view, does not suffice to meet the State's burden of justifying this discriminatory statute.[17] Moreover, whatever credibility or probativeness such evidence may have is undermined by documentary evidence strongly suggesting that the statute was motivated by economic protectionism. Indeed, this case may present one of those "rare instance[s] where a state artlessly discloses an avowed purpose to discriminate against interstate goods." *Dean Milk,* 340 U.S. at 354, 71 S.Ct. at 297.

The documents presented in the preceding section on "Discriminatory Effect" reveal that § 13–0349 was enacted "for the protection of the [New York] commercial fishing industry," to quote Assemblyman Behan's letter. JX 1. The bill's proponents were particularly concerned to protect local fishers from the inherent commercial advantages of larger vessels (such as the Atlantic Prince) which, unlike New York fishing boats, have the capacity to carry on-board freezing and packaging facilities and related crew.[18] Assemblyman Behan's letter, while not by itself dispositive,[19] highlights the essentially protectionist purpose of the 90–foot limit:

---

**16.** Because the court finds that Mr. Mason's ambivalent testimony regarding the environmental damage caused by large net doors is insufficient to supply a "legitimate local purpose" for the statute, it is unnecessary to determine whether the State has met its burden of demonstrating the unavailability of nondiscriminatory alternatives, such as direct regulation of the size and weight of net doors.

The court notes that, on this point, Mr. Mason testified that it would be possible for the state to directly regulate net size (and thus door size), but that experimental simulation using models and water tanks had shown that it would be "very ineffectual" for large boats to tow small nets, because "[t]hey wouldn't fish right." Tr3. 66.

**17.** This finding, "like any other form of factfinding, '"is the basic responsibility of district courts, rather than appellate courts[.]"'" *Taylor,* 477 U.S. at 144–45, 106 S.Ct. at 2451–52 (quoting *Pullman–Standard v. Swint,* 456 U.S. 273, 291, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982) (quoting in turn *DeMarco v. United States,* 415 U.S. 449, 450, 94 S.Ct. 1185, 1186, 39 L.Ed.2d 501 (1974))). As such, it is subject to reversal only if "clearly erroneous." *See Taylor,* 477 U.S. at 145, 106 S.Ct. at 2451.

**18.** Only four crew members of the Atlantic Prince catch fish; the remaining seventeen man the freezing/packaging facilities.

**19.** Defendants argue that this court should not consider Assemblyman Behan's letter or the damaging aspects of the DEC documents. They rely on *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979)

This section is specifically intended to limit large foreign vessels equipped with processing equipment. At this time, foreign fleets are preparing to introduce into New York State waters vessels in excess of 90 feet with freezer-processor capabilities. Such vessels will create an imbalance in the state's fishery and provide foreign fleets with an unfair advantage over the state's commercial fishing industry.

Similarly, DEC's written testimony submitted to the State Senate warned that "new, large domestic freezer trawlers currently entering the northwest Atlantic fishery will greatly exacerbate user conflicts currently being experienced in New York." DX N at pp. 6–7. *See also* PX 3 (same).

These protectionist fears were well-founded. Large "freezer-processor" vessels can fish for days at a time, freezing their catch as they go, whereas New York's smaller boats must unload their catch each day for shipment to on-shore freezing and packaging facilities. Tr1. 19–

24. Freezer processors can freeze highly perishable squid immediately, resulting in a fresher, higher-quality product which commands a higher price than squid caught by smaller boats. Tr2. 21, 32–33, 47–48. In contrast, the owners of some smaller boats have given up fishing due to the poor market for "second grade" squid processed at on-shore facilities. Tr2. 33, 47.

## CONCLUSION

The court finds that the State has not met its burden of demonstrating that the 90–foot limit it imposes on fishing boats in New York waters serves any legitimate local purpose. Rather, the evidence establishes that economic protectionism, and not environmental protection, motivated the State to enact this law.

The challenged statute reflects an understandable attentiveness to the economic well-being of interests represented in the New York legislature. Just as understandably, short shrift was given to the economic well-being of everyone else.[20] As Justice

("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history."); *Consumer Product Safety Commission v. GTE Sylvanian, Inc.,* 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980) (same); *Weinberger v. Rossi,* 456 U.S. 25, 35, 102 S.Ct. 1510, 1517, 71 L.Ed.2d 715 (1982) (same). The court does not find Assemblyman Behan's letter or the DEC documents to be "controlling" in determining the constitutionality of the statute. Indeed, those documents are not strictly necessary to the court's holding, since the State has failed to carry its burden of proof even if the documents are excluded from consideration. However, the court finds the documents probative, particularly on the issue of whether § 13–0349 embodies a "legitimate local purpose."

Defendants also cite *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), in which the Supreme Court refused to consider whether Congress intended to restrict expressive activity when it enacted a statute outlawing the burning of draft cards. The Court found that the statute regulated conduct harmful to the Selective Service System and did not single out expressive activity. Accordingly, the statute did not even implicate the First Amendment, and the Court would not search the legislative history for signs of an ulterior motive. In the Commerce Clause context, however, once a court finds a statute discriminatory, the case law commands that it search for an

ulterior motive. If it did not, the Commerce Clause would be rendered ineffective except in "the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods." *Dean Milk Co.,* 340 U.S. at 354, 71 S.Ct. at 297. Whatever may be the case in the First Amendment context, here the court is required to determine whether or not the statute serves a legitimate local purpose, and therefore it cannot simply ignore probative evidence of legislative motive. *See also* Regan, "Dormant Commerce Clause," 84 *Mich.L.Rev.* at 1146 (propriety and adequacy of legislative motive review depend on specific area of law in question).

Finally, the court notes that this statute does not include a statement of its own purpose. A court must defer to such statements "unless an examination of the circumstances forces [it] to conclude that [the stated purpose] 'could not have been a goal of the legislation.' " *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 458–61, 463 n. 7, 471 n. 15, 101 S.Ct. 715, 721–22, 723 n. 7, 727 n. 15, 66 L.Ed.2d 659 (1981) (quoting *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975)); *accord Norfolk Southern Corp. v. Oberly,* 822 F.2d 388, 403 & n. 21–22 (3d Cir.1987). Nor has the State's highest court authoritatively construed the purpose of this statute, as was the case in *Clover Leaf Creamery.*

**20.** In numerous dormant Commerce Clause cases, the Supreme Court has observed that leg-

Cardozo explained half a century ago, it is the special function of the Commerce Clause to safeguard the national economy from this inherent aspect of local representation:

> The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.

*Baldwin v. A.F. Seelig,* 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935).

The court finds that N.Y. Envtl.Conserv.Law § 13–0349 violates the Constitution, and is a legal nullity, and the court permanently enjoins the State from enforcing that statute in any manner against any persons or entities in the world, including the plaintiff. The State is ordered to issue any fishing licenses which it previously denied on the ground that issuance of said licenses would have violated § 13–0349, and is ordered henceforth not to deny any fishing license on that ground. No fishing license application will be denied as being untimely if it was originally filed on time; nor will any fishing license application be denied due to delays which are not attributable to the applicant.[21]

This memorandum and order constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

SO ORDERED.

---

islation burdening only out-of-state interests not represented in the state legislature is "not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state." *South Carolina State Highway Department v. Barnwell Brothers, Inc.,* 303 U.S. 177, 184 n. 2, 58 S.Ct. 510, 513 n. 2, 82 L.Ed. 734 (1938); *Southern Pacific Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 767 n. 2, 65 S.Ct. 1515, 1519 n. 2, 89 L.Ed. 1915 (1945). *See also Raymond Motor Transportation, Inc.,* 434 U.S. at 444 n. 18, 98 S.Ct. at 795 n. 18; *Consolidated Freightways Corp.,* 450 U.S. at 675–76, 101 S.Ct. at 1318–19; J. Ely, *Democracy and Distrust* 83–84 (1980); L. Tribe, *American Constitutional Law* (2d ed.1988) § 6–5.

By the same token, courts are far less likely to find a Commerce Clause violation where a statute visits some of its adverse effects upon in-state interests represented in the legislature. *See Clover Leaf Creamery Co.,* 449 U.S. at 472–73 & n. 17, 101 S.Ct. at 728–29 n. 17; *Consolidated Freightways Corp.,* 450 U.S. at 675, 101 S.Ct. at 1318; *Cresenzi Bird Importers, Inc. v. State of New York,* 658 F.Supp. 1441, 1447 n. 4 (S.D.N.

Y.), *aff'd on opinion below,* 831 F.2d 410 (2d Cir.1987). That is not the case here. As previously discussed, there was—at most—only one New York fishing vessel over 90 feet long when § 13–0349 was enacted. While Mr. Mason stated that other New York fishers were contemplating buying large freezer-processor vessels at the time § 13–0349 was enacted, Tr2. 23, the court finds this irrelevant. Commerce Clause analysis, already rather complex, would become utterly bewildering if the courts were required to evaluate discriminatory effect by looking to "potential" or "prospective" burdens and benefits. *Cf. Limbach,* 108 S.Ct. at 1809 (refusing to further complicate dormant Commerce Clause doctrine because it would "serve no purpose except the creation of new uncertainties in an already complex field.").

21. The court finds it unnecessary to address defendants' argument that § 13–0349 resembles statutes enacted by several other states. Defendants have not suggested that these statutes have been constitutionally tested in the courts, nor is the constitutionality of those statutes before this court.