**DAVROD CORPORATION, et al., Plaintiffs, Appellants,**

v.

**Philip G. COATES, etc., et al., Defendants, Appellees.**

**DAVROD CORPORATION, et al., Plaintiffs, Appellees,**

v.

**Philip G. COATES, etc., et al., Defendants, Appellants.**

**Nos. 91–1629, 91–1710.**

United States Court of Appeals, First Circuit.

Heard Dec. 4, 1991.

Decided July 22, 1992.

As Amended Aug. 21, 1992.

**780**

Ronald R. Coles, with whom Coles and Mongue, Kennebunk, Me., was on brief, for plaintiffs, appellants.

Douglas H. Wilkins, Asst. Atty. Gen., with whom Scott Harshbarger, Atty. Gen., Boston, Mass., was on brief, for defendants, appellees.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and POLLAK,* Senior District Judge.

LOUIS H. POLLAK, Senior District Judge.

This case challenges the enforcement by an agency of the Commonwealth of Massachusetts—the Division of Marine Fisheries of the Department of Fisheries, Wildlife and Environmental Law—of certain rules governing fishing and the processing of fish in the coastal waters of Massachusetts. The rule that was the catalyst of this controversy is a regulation, adopted by the Division of Marine Fisheries in 1985, that bars vessels longer than ninety feet from fishing in Massachusetts waters. By a margin of six inches, Huntress I, a so-

* Of the Eastern District of Pennsylvania, sitting by designation.

1. By amendment to the pleadings, Davrod's marketing subsidiary, Deep Sea Fish of Rhode

called "freezer-trawler" home-berthed at Point Judith, Rhode Island, ran afoul of the regulation and hence was barred by the Division from fishing for loligo squid in 1990 in the squid-rich waters of Nantucket Sound and Vineyard Sound. In the following year, the Division did give Huntress I a permit for at-sea processing (i.e., cleaning, freezing and packaging) of loligo squid caught by other vessels. But the 1991 permit set a cap of two hundred and fifty metric tons on the quantity of loligo squid Huntress I could process. In an action filed in the District Court for the District of Massachusetts, both the vessel-length limitation on fishing and the quantity limitation on at-sea processing were challenged on dual grounds. First, it was contended that the limitations constitute an undue burden on commerce. Second, it was contended that the Massachusetts limitations are incompatible with supervening, and hence preemptive, provisions of a federal statute, namely, the Fishery Conservation and Management Act (16 U.S.C. § 1851, et seq.), more generally known either as the Magnuson Act or as the FCMA.

The district court sustained the ninety-foot fishing-vessel length limitation. But the court enjoined enforcement of the ceiling on the quantity of squid processed at sea, finding that limitation to be an impermissible burden on commerce. On appeal, agreeing with the district court that the ninety-foot rule is valid, we affirm so much of the district court's judgment as denied an injunction against enforcement of the rule. On cross-appeal, we vacate the injunction against enforcement of the ceiling on at-sea processing and we remand for further proceedings.

## I.

*Procedural History*

This case began in 1990. Davrod Corporation, the Rhode Island company that owns Huntress I,[1] brought an action in the

Island, Inc., was named as an additional plaintiff. Since Davrod's and Deep Sea's interests and positions in the litigation appear to be iden-

Massachusetts District Court seeking—in reliance on the commerce clause and, alternatively, on the assertedly preemptive force of the Magnuson Act/FCMA—declaratory and injunctive relief with respect to the ninety-foot length limitation. The ninety-foot rule is embodied in two companion regulations—Regulation 8.05 and Regulation 8.11(1)—adopted by the Division of Marine Fisheries in 1985.

Regulation 8.05 (322 C.M.R. § 8.05) is as follows:

> Vessels greater than ninety (90) feet registered length may not conduct fishing activities in any waters under the jurisdiction of the Commonwealth. This restriction shall not apply to purse seine vessels.

Regulation 8.11(1) (322 C.M.R. § 8.11(1)) is as follows:

> It is unlawful for:
>
> (1) any vessel, other than purse seine vessels, greater than ninety (90) feet in registered length to conduct fishing activities in any waters under the jurisdiction of the Commonwealth: ....

### A. The district court's denial of preliminary injunctive relief

Davrod sought a preliminary injunction barring enforcement of the length limitation against Huntress I. Following an evidentiary hearing, the district court, in November of 1990, determined that Davrod had not demonstrated its entitlement to a preliminary injunction:

---

tical, we will refer to plaintiffs collectively as "Davrod."

There is some ambiguity about who the defendants are. It is clear that both the Commonwealth's Division of Marine Fisheries and the Division's Director, Philip G. Coates, have been named as defendants. What is unclear is whether the Commonwealth itself has also been so named. The Massachusetts Attorney General, as counsel for defendants, is of the view that the Commonwealth is a named defendant; further, the Attorney General contends that the Eleventh Amendment bars maintenance of this suit both against the Commonwealth and against the Division. For our part, while we read paragraph 3 of the amended complaint to name the Division as a defendant, and paragraph 4 to name Mr. Coates as a defendant, we do not read any paragraph of the amended complaint to name the Commonwealth as a

The plaintiff alleges that these regulations constitute a discriminatory and unreasonable burden on interstate commerce, citing *Atlantic Prince, Ltd. v. Jorling*, 710 F.Supp. 893 (E.D.N.Y.1989). The defendant claims that the regulations are not discriminatory and constitute a reasonable measure for the conservation of the commonwealth's fisheries, and in particular the stock of squid which is at issue in this case.

In *Atlantic Prince*, the court found a clear paper trail showing the discriminatory intent of the New York authorities to protect local fishermen and processors from out-of-state competition. Among other circumstances it appeared that the New York 90–foot rule would not affect the local fleet, which contained no vessels over 90 feet in length.

No such heavy discriminatory footprints appear in this case. There are a number of Massachusetts fishing vessels over 90 feet in length which could be converted to squid fishing. The plaintiff suggests, however, that since the larger vessels are equipped to process the squid at sea, this regulation is intended to protect shore-based processors. The defendant takes the position that processing at sea increases the risk to the stock of squid because the same number of catching vessels can catch more squid if a processing vessel is conveniently located on the fishing grounds.

---

defendant. However that may be, we agree with the Attorney General that—absent a waiver of Eleventh Amendment immunity by the Commonwealth or abrogation of that immunity by a valid federal statute, neither of which is claimed here—neither the Commonwealth nor the Division is suable by Davrod. *Lane v. First National Bank of Boston*, 871 F.2d 166, 167–69 (1st Cir. 1989). "This jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984); *accord, Papasan v. Allain*, 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986). And see *Southern Pacific v. City of Los Angeles*, 922 F.2d 498, 508 (9th Cir.1990); *Neuwirth v. Louisiana State Bd. of Dentistry*, 845 F.2d 553, 555 (5th Cir.1988). But this suit can be maintained against Mr. Coates.

Plaintiff further asserts that the regulation is unnecessary because squid are not an endangered species and may indeed be underutilized. It challenges the regulations as being unrelated to conservation because they are not accompanied by any concomitant restriction on the number of smaller boats that are permitted to engage in squid fishing in Massachusetts waters, or limitations on the size of the equipment used or the number of squid that may be landed.

The defendant has responded by asserting the following bases for the regulations, which I find to be reasonably related to the goal of conservation and supported by the evidence:

1. Experience indicates that measures to conserve a fishery should be taken before the stock is depleted and the species endangered.

2. Larger vessels can catch more squid than smaller ones because they can tow larger nets and remain on the fishing grounds for long periods, staying out at night and in bad weather.

3. The presence of vessels with the capacity to process squid at sea enables the smaller vessels to catch more squid.

4. This shift of large vessels to inshore fishing as a result of the judgment of the World Court giving part of George's Bank to Canada creates a present problem; the possible proliferation of smaller boats does not.

5. Other methods of restricting the catch of squid are more difficult to enforce.

The efficacy of the challenged regulations may be open to debate, but the plaintiff has not carried its burden of showing that the defendant has no rational basis for imposing or enforcing them. Accordingly, I can not at this stage rule that the plaintiff is likely to succeed on the merits, and the motion for a preliminary injunction must be denied.

At the close of its memorandum/order denying a preliminary injunction, the district court made the following observations:

The evidence reveals an ambiguity which should be addressed in any further proceedings in this case. Although the regulations by their terms forbid vessels over 90 feet "to conduct fishing activities" in Massachusetts waters, larger vessels are apparently permitted on a selective basis to act as factory ships only. They remain on the fishing grounds (primarily Nantucket Sound) where they receive and process squid from smaller vessels, but do no fishing themselves. The defendant's own exhibits reflect the judgment that processing at sea results in a more marketable product and a better return for the fisherman. A proper balancing of interests for constitutional purposes requires further consideration of the possibility that the regulations should be amended to reflect the economic facts. The potential for discrimination inherent in the present selective practice also mandates further examination by the court.

B. *The district court's grant of a permanent injunction against enforcement of a limitation on the quantity of squid processed at sea*

In January of 1991, Davrod filed an amended complaint. Again invoking the commerce clause and, in the alternative, the Magnuson Act, the new pleading reiterated the challenge to the ninety-foot length limitation and also took aim at what the district court had opined was the Division's apparent practice of permitting "larger vessels ... on a selective basis to act as factory ships only." Davrod alleged that it had applied for an at-sea processing permit "for the 1990 loligo squid season in Nantucket Sound ... and was refused without explanation or reason." Davrod further alleged that at-sea processing permits "are issued in a discriminatory manner in violation of the Commerce Clause so as to limit and/or deprive nonresident commercial fishing/at sea freezer vessels from purchasing freshly caught loligo squid for at sea processing."

On April 17 and 18, 1991, the district court held a further evidentiary hearing addressed to Davrod's expanded claims and

its request for permanent injunctive relief with respect to both claims. On April 25, 1991, the Division issued a permit, valid until June 15, 1991, authorizing Huntress I to engage in at-sea processing of loligo squid caught in Nantucket and Vineyard Sounds by other vessels and transferred to Huntress I. The permit was subject to two sets of conditions. One was that "[t]he operation is limited to 250 metric tons (551,-000 pounds) of Loligo squid," and hence that "[t]his permit shall terminate upon reaching the 250 ton allocation of squid ..." The other—intended to curtail the transfer to, and consequent demise of, the non-squid "by-catch" indiscriminately and unavoidably hauled in by the drag nets of vessels fishing for squid—was that: "All catch ... must be sorted before squid can be transferred to the at-sea processing vessel. All sub-legal finfish and all prohibited species ... must be removed before transfers and immediately returned to the sea."

On June 10, 1991, the district court filed its Findings, Rulings and Order for Judgment. The court began by addressing, and rejecting, Davrod's claim that the challenged Massachusetts rules work a denial of equal protection of the laws:[2]

> The 90 foot limitation applies to all types of fishing in Massachusetts waters and to the numerous Massachusetts based fishing vessels over 90 feet in length. While none of the Massachusetts vessels are presently equipped for at-sea processing, I have no doubt from the context of these regulations and the statements of defendant witnesses, that the local vessels would be equally subject to the regulations. The exception cre-

ated by the defendants for purse seiners has in fact benefitted out-of-state fishermen.[3] The protection provided to land-based processors is not designed to favor just Massachusetts residents but all land-based processors which serve Massachusetts fisheries, which include processors in Rhode Island and New Jersey. The protection is offered to a particular form of economic activity, regardless of residency, and accordingly is more appropriately analyzed under the commerce clause than under the equal protection clause.

Before addressing Davrod's commerce clause claims, the district court dismissed Davrod's Magnuson Act-preemption claims:

> Nantucket and Vineyard Sounds are subject to the jurisdiction of Massachusetts, and the United States has not preempted the control of the fishery therein, except for the general constraints imposed by the commerce clause. 16 U.S.C. § 1856(2)(A) and (B).

As to the commerce clause claims, the district court ruled as follows:

> In my view, the 90–foot length restriction is a proper regulation of the means of catching fish, and is reasonably related to conservation of the fishery. Other conservation means would not impose a substantially lighter burden on interstate commerce. This branch of the case is analogous to *Manchester v. Massachusetts* [139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891)], *supra*, and *Maine v. Taylor* [477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)], *supra*. Accordingly, the plaintiff's prayer for an injunction of the enforcement of this regulation is denied.

---

**2.** Neither the amended complaint nor the original complaint set out an equal protection claim, but the district court evidently regarded such a claim as within the ambit of the issues discussed in its November 1990 memorandum/order, 1990 WL 180712, denying a preliminary injunction and examined in the April 1991 hearing.

**3.** Huntress I is a trawler, not a purse seiner. The exemption of purse seiners from the length-limitation imposed on trawlers is not at issue in this case. "A purse seine is entirely different from a drag net or trawl net. A purse seine is used to catch a different kind of fish, pelagic fish ... a fish that's schooled not on the bottom.

In particular, herring, sea herring, menhaden, mackerel, those are the sorts of species that would be caught by that net. It's not a net that's dragged on the bottom by a boat. A school of fish is detected by a fishing vessel and a smaller boat would be dropped off the side of that and it would then encircle the school of fish and the bottom of the net is closed like a purse. Using a wench [sic] on board the larger vessel, the net is gradely [sic] trailed over the side and the fish are pumped out.... [T]he by-catch is, well, very little. It's a very species specific fishery." Testimony of David E. Pierce, an aquatic biologist at the Division of Marine Fisheries.

The restriction on the quantity of squid which may be processed by at-sea processors presents another story. In the absence of a comparable and proportionate restriction on shore based processors[1], or a limitation on the total catch, it is hard to find a legitimate conservation purpose in this restriction. It appears to be solely related to the protection of shore based processors. It is clear that this is not adequate justification for burdening interstate commerce. This case is analogous to *Foster–Fountain Packing Co. v. Haydel* [278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928)], *Toomer v. Witsell* [334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948)], and *Pike v. Bruce Church, Inc.* [397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)], all *supra.*

The effect of the anomalous case of *Exxon v. Governor of Maryland* [437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978)], *supra,* is a puzzle, but the puzzle need not be solved because the case may be distinguished from the present situation. In *Exxon,* the Court made the point that the state regulations did not interfere with the flow of petroleum products into Maryland. In this case the restriction on at-sea processing burdens interstate and foreign commerce by interfering with the quality of the product, and by favoring a method of processing which denigrates the competitive position of American squid in foreign markets. There is, furthermore, an obviously more effective and less burdensome conservation method, namely, shortening the season. The value of such a measure is manifested by the fact that the immature squid, upon which the future of the stock depends, do not appear until relatively late in the season.

Requiring presorting before delivery to the at-sea processing vessel is a perfectly proper measure for the conservation of other species and of immature squid.

An injunction shall issue in accordance with the foregoing.[4]

---

[1] This measure would make everyone the loser. Aside from the difficulty of establishing proportionate restrictions, the defendants cannot control shore based processors outside of Massachusetts. If all the Massachusetts facilities were to be restricted, the fishermen would take their catch elsewhere, and Galilee, Rhode Island would become the squid capital of the world.

From the district court's denial of an injunction with respect to the ninety-foot length limitation on fishing vessels, Davrod has appealed. And a cross-appeal has been taken by the Division of Marine Fisheries from the district court's grant of an injunction with respect to the two-hundred-and-fifty metric ton limitation on at-sea processing of loligo squid.

## II.

Davrod's appeal and the Division's cross-appeal will be addressed in sequence. With respect to each, we will examine first the question whether the Fishery Conservation and Management Act (FCMA)—i.e., the Magnuson Act—is preemptive of state authority and hence wholly forecloses fisheries regulation by the Division in the waters adjacent to Nantucket and Martha's Vineyard. We consider the preemption issue first because, if Davrod is correct on what is essentially a question of statutory interpretation, it becomes unnecessary to consider Davrod's constitutional claims.

---

**4.** The district court's recital that "the restriction on at-sea processing burdens interstate and foreign commerce by interfering with the quality of the product, and by favoring a method of processing which denigrates the competitive position of American squid in foreign markets," evidently rests on certain factual findings made by the court:

The plaintiff had offered uncontradicted testimony that the freshness of squid offered for sale is a major factor in the substantial foreign market (principally Italy, Spain and Japan) in which most of the harvested squid are sold. Squid processed soon after it is caught is superior in appearance and shelf life to squid processed many hours after it is caught. In this respect, at-sea processing in general produces a product which is more desirable and fetches a higher price on the market than that produced by shore based processors.

## A. *The ninety-foot length limitation*

### (1) Preemption

█ It is Davrod's submission that "the state regulation is preempted by federal law, namely, the Magnuson Fishery Conservation and Management Act." Brief of Appellant, p. 25.

The statute in question, enacted in 1976, was an elaborate and path-breaking legislative enterprise intended to protect the American fishing industry, and to preserve endangered stocks of fish, from what were perceived to be predatory incursions by foreign fishing fleets into American waters. The general design of the legislation was compendiously summarized by Congressman Forsythe of New Jersey in 1982 when explaining to his colleagues in the House of Representatives the need for certain strengthening amendments (128 *Cong. Rec.* 31695 (97th Cong.2d Sess., Dec. 16, 1982)):

> The purpose of this historic act was to provide for the conservation and management of important fishery resources found off the coasts of the United States. The significance of this legislation can be appreciated by considering the state of the fishing industry and of the fisheries themselves in the 20 years which preceded enactment of this legislation. During that period world fish production multiplied more than threefold, from 20 million metric tons to approximately 72.4 million metric tons, yet the U.S. share of the catch hovered between 2 and 2.2 million metric tons. While the U.S. harvest of fish remained relatively stable, other nations with large and efficient fleets—many of which were subsidized—substantially increased the amount of fish harvested off our coasts. This situation led to the over-fishing of at least 10 major commercial stocks and caused serious economic consequences for the U.S. industry.

As a means of mitigating this over-fishing and of achieving the objective of effectively conserving fishery resources, the FCMA established a 197-mile fishery conservation zone adjacent to the 3-mile territorial sea. Approximately 20 percent of the world's fishery resources are contained within this 200-mile zone. The act also provided for the creation of eight regional fishery management councils which have the responsibility of developing fishery management plans. These plans identify, for each fishery, the optimum yield which could be harvested annually, the U.S. harvest, the total allowable level of foreign fishing, and the management rules governing foreign and domestic harvests. The Secretary of Commerce is responsible for the review and approval of each plan and the Secretary of State, in consultation with the Secretary of Commerce, is charged with the responsibility of allocating, among foreign nations, the surplus fish not harvested by U.S. fishermen.

As originally enacted, section 306(a) of the Magnuson Act—16 U.S.C. § 1856(a)—provided as follows with respect to "state jurisdiction:"

> Except as provided in subsection (b), nothing in this Act shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries. No State may directly or indirectly regulate any fishing which is engaged in by any fishing vessel outside its boundaries, unless such vessel is registered under the laws of such State.[5]

The statutory reservation of "state jurisdiction" was explained in the House Report in the following terms (H.Rep. No. 94-445, p. 29) (Merchant Marine and Fisheries Committee, August 20, 1975), 2 U.S.C.C.A.N. 94th Cong.2d Sess.1976, pp. 593, 602:

> Under United States law, the biological resources within the territorial sea of the

---

**5.** The exception contained in subsection (b) is one which, as described in the Senate Conference Report, was designed to permit the United States "to regulate a fishery ... within a state's boundaries" when the Secretary of Commerce makes a finding that state regulatory action or omission "will substantially and adversely effect the carrying out of a fishery management plan covering such fishery." Senate Conference Report No. 94-711, March 24, 1976, page 55, 2 U.S.C.C.A.N., 94th Cong.2d Sess.1976, 679. No suggestion has been made in this case that the exception bears in any way on the issues presented.

United States (i.e., out to 3 miles) are the management responsibility of the adjacent several States of the Union. Whatever regulation of both fishermen and fish harvest, that occurs in this area is as deemed necessary and appropriate by each concerned State.

Thus, the Magnuson Act as originally framed confirmed state jurisdiction over fisheries within a State's internal waters and, for coastal states, out to the three-mile limit. By an amendment adopted in 1983, Congress expanded the jurisdiction of coastal states by adding to section 306(a), 16 U.S.C. § 1856(a), the following language:

> (2) For the purposes of this chapter, except as provided in subsection (b) of this section, the jurisdiction and authority of a State shall extend—
>
> (A) to any pocket of waters that is adjacent to the State and totally enclosed by lines delimiting the territorial sea of the United States pursuant to the Geneva Convention on the Territorial Sea and Contiguous Zone or any successor convention to which the United States is a party;
>
> (B) with respect to the body of water commonly known as Nantucket Sound, to the pocket of water west of the seventieth meridian west of Greenwich
>
> . . .

This enlargement of State jurisdiction was explained by Congressman Studds of Massachusetts as follows:

Section 9 of the amendment addresses those limited situations where Federal waters are surrounded by State waters. The presence of these pockets creates incongruous fishery management schemes and presents significant problems in the area of fisheries law enforcement. Nantucket Sound is identical to these areas and creates the same fishery management problems, although not totally enclosed by the territorial sea. At the eastern edge of the sound the lines delimiting the territorial sea come within 1 mile of intersecting each other.

I am pleased that the amendment now before us includes language which I requested to resolve this problem. Quite simply, it treats Nantucket Sound as the other affected areas. Historically, the Massachusetts Division of Marine Fisheries provided the management of the fisheries in the sound, fisheries law enforcement, conducted stock assessments and other fishery related research, and continues to do so today. By insuring a unified fisheries management regime, this amendment will enhance fishery conservation and fisheries law enforcement in the sound.[6]

Thus, the Magnuson Act, as amended in 1983, does not preempt the Commonwealth's regulatory authority with respect to Massachusetts' off-shore waters; to the contrary, section 1856(a), as amended, expressly confirms that regulatory authority.[7] The district court correctly concluded

---

6. 128 *Cong. Rec.* 31685 (97th Cong.2d Sess., Dec. 16, 1982). A year later, section 1856(a) was again amended to extend state jurisdiction to cover portions of "the waters of Southeastern Alaska (for the purpose of regulating fishing for other than any species of crab)."

7. Under the caption of preemption, Davrod in its principal brief also argues that the ninety-foot length limitation is in some sense incompatible with various policy directives contained in the Act (e.g., "Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen . . ."). 16 U.S.C. § 1851(a)(4). On the basis of such hortatory statutory recitals, Davrod contends that "[T]he Massachusetts' 90-

Foot Rule is a blatant attempt to supercede the Magnuson Act as the Rule directly impedes the Act's purposes of promoting fishing among the States." Brief of Appellant, p. 31. This is, strictly speaking, not a preemption argument— i.e., a submission that Massachusetts lacks regulatory jurisdiction—at all. It is more properly to be understood as a contention that the Division is exercising a regulatory authority delegated to Massachusetts by Congress in a manner inconsistent with federal statutory directives. But Davrod has not identified any statutory directives that deal—either expressly or by implication—with the permitted length of fishing vessels or the permitted quantity of at-sea processing of loligo squid. To the extent that Davrod relies on such a generalized statutory prescription as avoidance of discrimination "between residents of different states," suffice it to say that Congress has not undertaken in the

that "Nantucket and Vineyard Sounds are subject to the jurisdiction of Massachusetts ..."[8]

### (2) Burden on Commerce

■ In *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 843 (1st Cir.1988), we said:

Article I, section 8 of the Constitution gives Congress "Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." If a state regulates interstate commerce in a manner inconsistent with that prescribed by Congress, the state regulation is preempted by the federal law, and is therefore constitutionally impermissible. Where Congress has not acted directly, nothing in the Commerce Clause explicitly prohibits the states from regulating interstate commerce. Nevertheless, the Supreme Court has established a doctrine, sometimes denominated the "dormant Commerce Clause," under which the states are barred from regulating interstate commerce in a manner which significantly interferes with the national economy.

In *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986), the Supreme Court observed that:

In determining whether a State has overstepped its role in regulating interstate commerce, this Court has distinguished between state statutes that burden interstate transactions only incidentally, and those that affirmatively discriminate against such transactions. While statutes in the first group violate the Commerce Clause only if the burdens they impose on interstate trade are "clearly excessive in relation to the putative local benefits," *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 [90 S.Ct. 844, 847, 25 L.Ed.2d 174] (1970), statutes in the second group are subject to more demanding scrutiny. The Court explained in *Hughes v. Oklahoma*, 441 U.S. [322], at 336 [99 S.Ct. 1727, 1736, 60 L.Ed.2d 250] (1979), that once a state law is shown to discriminate against inter-

Magnuson Act (1) to provide any concrete definition of that principle or cognate principles, or (2) to confer standing on private parties to enforce such principles (as compared with, for example, the authority of the United States, pursuant to section 306(b), 16 U.S.C. § 1856(b), to supersede state regulatory authority when the Secretary of Commerce finds that state administration is impairing a federal fishery management plan: see note 5, *supra*). Principles of this sort may prove more useful when considered under the rubric of the commerce clause and/or the privileges and immunities and equal protection clauses, discussed *infra*.

**8.** The district court was on sound ground in lumping Vineyard Sound together with Nantucket Sound, notwithstanding that neither § 1856(a), as amended, nor Congressman Studds mentioned Vineyard Sound. A glance at the map suggests why Congress would not have thought it necessary to fashion antipreemptive statutory language referring in so many words to Vineyard Sound: Vineyard Sound is substantially smaller than Nantucket Sound and considerably more land-bound.

Three years after § 1856(a) was amended, the Court had occasion, in *United States v. Maine*, 475 U.S. 89, 91, 106 S.Ct. 951, 952, 89 L.Ed.2d 68 (1986), to consider the legal status of Vineyard Sound and the legal status of Nantucket Sound:

... [T]he United States and Massachusetts in 1977 filed a joint motion for supplemental proceedings to determine the location of the Massachusetts coastline. After our appointment of a Special Master, 433 U.S. 917 [97 S.Ct. 2994, 53 L.Ed.2d 1104] (1977), the parties agreed on a partial settlement, which we approved in 1981. 452 U.S. 429 [101 S.Ct. 3074, 69 L.Ed.2d 132]. Left unresolved was the status of Vineyard Sound and Nantucket Sound, a dispute which gave rise to extensive hearings before the Special Master. The Master concluded that Vineyard Sound is a "historic bay" and therefore a part of the inland waters of Massachusetts. However, he reached a contrary conclusion concerning Nantucket Sound. Explaining that the decision concerning Vineyard Sound has only minimal practical significance,[2] the United States has taken no exception to the Master's report. Massachusetts, however, has excepted to that part of the report concerning Nantucket Sound. Specifically, although Massachusetts acquiesces in the determination that the doctrine of "historic title" does not support its claim, it continues to maintain that it has "ancient title" to Nantucket Sound.

2. According to the Solicitor General, all but 1,000 acres of the submerged lands of Vineyard Sound belong to the Commonwealth of Massachusetts as underlying territorial waters, even under its view that those waters are not inland.

The Court overruled Massachusetts' exception to the Special Master's report.

state commerce "either on its face or in practical effect," the burden falls on the State to demonstrate both that the statute "serves a legitimate local purpose," and that this purpose could not be served as well by available nondiscriminatory means.

In challenging the district court's determination that "the 90–foot length restriction is a proper regulation of the means of catching fish, and is reasonably related to conservation of the fishery," Davrod contends that the length restriction must be judged under the strict *Hughes v. Oklahoma* standard. Davrod contends that, although the length limitation "may appear neutral on its face, it is discriminatory in practical effect because there are no Massachusetts freezer/trawler squid fishing vessels which are greater than 90–feet in length." Brief of Appellant, p. 18.

Davrod's attempt to characterize the length limitation as one aimed at "freezer-trawler squid fishing vessels" is not persuasive. The limitation—"vessels greater than ninety (90) feet registered length may not conduct fishing activities in any waters under the jurisdiction of this Commonwealth"—is comprehensive in its terms. And the district court found the limitation to be comprehensive in its actual application. "The 90–foot limitation applies to all types of fishing in Massachusetts waters and to the numerous Massachusetts fishing vessels over 90 feet in length." Both aspects of this finding are grounded in the record. The district court's recital that "[t]he 90–foot limitation applies to all types of fishing" is confirmed by the testimony

of David E. Pierce, an aquatic biologist on the staff of the Division of Marine Fisheries: "The 90–foot limit was not applied to freezer-trawlers. It was applied to all vessels."[9] The district court's reference to "the numerous Massachusetts fishing vessels over 90 feet in length" finds support in a 1990 Division of Marine Fisheries list of ninety vessels, with offshore lobster permits, exceeding ninety feet in length: seventy-one of the ninety vessels were berthed in Massachusetts, nineteen in other states.[10] In short, the limitation "is nondiscriminatory, because it applies equally to both intrastate and interstate [enterprises]." *Hyde Park Partners, supra,* 839 F.2d at 844.

Davrod does make the further argument that the Massachusetts length limitation should be struck down because Judge Glasser, in the District Court for the Eastern District of New York, "found the identical New York 90–Foot Rule ... violative of the Commerce Clause," Brief of Appellant, p. 16, in *Atlantic Prince, Ltd. v. Jorling,* 710 F.Supp. 893 (E.D.N.Y.1989). "Strange as it appears," says Davrod, "our Court below never mentioned or cited *Atlantic Prince* even though the facts and applicable law of that case are mirror images to the instant case." Brief of Appellant, p. 16.

Davrod's statement is doubly flawed: *First,* the district court, in its memorandum/order denying Davrod's motion for preliminary injunction, did discuss *Atlantic Prince. Second*—and more important—the record in *Atlantic Prince* was far from the "mirror image" of the record in this

---

**9.** Earlier in Mr. Pierce's testimony, the following colloquy occurred:

Q. Were your concerns about larger vessels directed solely to freezer trawlers?

A. Absolutely not.

Q. What other types of vessels in excess of 90 feet were you concerned about?

A. Just regular fishing vessels. The standard fishing vessel that goes out and fishes on the offshore grounds and then comes back to unload its catch and that catch is processed by shore side processors. We weren't focusing in on any type of fisherman. The concern was with larger boats in general.

**10.** App. 813. David Pierce's testimony with respect to the 1990 list was as follows (App. 277):

Q. Why would a boat over 90 feet in length apply for a Massachusetts license?

A. Well, a vessel over 90 feet in length would apply for a license because it is required, and they would apply for that particular license because chances of their catching lobsters and taking lobsters are extremely high. Draggers catch lobsters when they are in offshore grounds. In order to—in anticipation of that fact, the agency has structured its permit system so that the permit reads as shown, offshore lobster permits. It doesn't mean it is a lobster fishing vessel, it's a dragger, a dragger going after fish that will occasionally take lobsters, inland lobsters caught in federal waters.

case. In *Atlantic Prince*, the challenged 1986 statute was adopted at a time when "there was, at most, only one New York commercial fishing vessel exceeding 90 feet in length." *Atlantic Prince*, 710 F.Supp. at 897. Moreover, Judge Glasser found, on the record before him, "that economic protectionism, and not environmental protection, motivated the State [of New York] to enact this law." *Id.* at 902.[11] In the instant case, the district court, in denying a preliminary injunction against enforcement of the length limitation, noted that:

> In *Atlantic Prince*, the court found a clear paper trail showing the discriminatory intent of the New York authorities to protect local fishermen and processors from out-of-state competition.[12] Among other circumstances it appeared that the New York 90-foot rule would not affect the local fleet, which contained no vessels over 90 feet in length.[13]

> No such heavy discriminatory footprints appear in this case. There are a number of Massachusetts fishing vessels over 90 feet in length which could be converted to squid fishing.

Given that the Massachusetts length limitation applies to all fishing vessels, wherever berthed, and given the further fact that Massachusetts fishing vessels longer than ninety feet greatly outnumber out-of-state vessels, it is apparent that the challenged regulation is not open to any general challenge that it burdens interstate commerce. If the limitation is considered more narrowly—i.e., as a regulation affecting squid fishing, rather than fishing generally—Huntress I is barred from participating, but it is also the case that Massachusetts fishing vessels exceeding ninety feet in length that are not now equipped for squid fishing but "which could be converted to squid fishing" are likewise barred. From this perspective, the strong-

est claim to be made against the length limitation is that it "burdens interstate transactions only incidentally," not that it "affirmatively discriminates against such transactions." *Maine v. Taylor, supra,* 477 U.S. at 138, 106 S.Ct. at 2447. This means that the operative test of the length limitation is not the strict *Hughes v. Oklahoma* standard, under which "the burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available non-discriminatory means." *Maine v. Taylor, supra,* 477 U.S. at 138, 106 S.Ct. at 2447. Rather, the test is whether "the burdens ... on interstate trade are 'clearly excessive in relation to the putative local benefits.'" *Ibid.*

The "putative local benefits" of the ninety-foot length limitation (and also of the June 15 cut-off of, and the two-hundred-and-fifty metric ton limitation on, at-sea processing, discussed *infra*) relate to conservation of the fish stock—a dominant regulatory concern at the state level as well as at the national level. With respect to loligo squid, Davrod contends that the Division of Marine Fisheries' conservation concern is over-blown. Dr. Steven Murawski, Chief of the Population Dynamics Branch of the National Marine Fisheries Service, at Woods Hole, testified that he did not regard loligo squid, in Nantucket and Vineyard Sounds, as "threatened" or "endangered," words which he recognized as having "a legal connotation." App. 521. And when the district court inquired whether loligo squid are "at risk," Dr. Murawski responded: "I guess I will reserve judgment. I haven't looked at the information. We haven't developed sufficient information to come to a consensus on the status in that area." *Id.* at 521–22. When

---

11. "Indeed," wrote Judge Glasser, "this case may present one of those 'rare instance[s] where a state artlessly discloses an avowed purpose to discriminate against interstate goods.'" *Id.* at 901 (quoting *Dean Milk Co. v. Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 297–98, 95 L.Ed. 329 (1951)). It is also to be noted that it was New York which, in 1986, replicated Massachusetts' earlier (1985) rule, not vice-versa.

12. See note 9, *supra*.

13. As noted *supra,* Judge Glasser actually found that there was "at most, only one New York commercial fishing vessel exceeding 90 feet in length." 710 F.Supp. at 897.

the district court rephrased the question, the following colloquy ensued:

> THE COURT: Let me change the question a little bit.
>
> If this regulation was ruled to be unconstitutional and these large freezer trawlers were permitted without restriction to fish in the Sound, would they put the stock of squid at risk?
>
> THE WITNESS: I guess I'd have to see it in the context of other regulations. If it was certainly an unrestricted access to all comers.
>
> One thing about squid, that stock is relatively healthy compared to the other fish in fishery sources like cod and haddock in this region. And so that's one of the reasons we have seen a greater interest in squid, just because all the alternatives have been over fished.
>
> So if, in fact, this is the only viable resource that is available to a lot of large trawlers, then, the potential certainly is there to collapse this stock quite quickly.
>
> THE COURT: Quite quickly?
>
> THE WITNESS: Yes. That's, in fact, what we saw when we had unrestricted fishing by the distant—the foreign fleets.

*Id.* at 522–23.

On the basis of this and other testimony, the district court made findings "Concerning Squid":

> Loligo squid are migratory, but their migrations are east and west, in contrast to the north-south migrations of other fish. They spend the winter on the continental shelf and return to shallow coastal estuaries in the spring to spawn. Nantucket Sound is one of the principal spawning grounds for loligo squid, which congregate there in greater concentration than anywhere else on the east coast of North America. (It is not clear whether spawning squid return to the place where they were themselves spawned.) Although the loligo squid in Nantucket sound represent only 14% of the squid population of the northeast Atlantic coast, 72% of the worldwide catch of this particular variety of squid is taken from Nantucket Sound. While the National Marine Fisheries Service has concluded that loligo squid in general is not endangered and is in fact underexploited, this conclusion relates to the deep water population off the northeastern coast of the United States. The Chief of the Population Dynamics Branch, Dr. Murawski, testified, however, that these findings have no bearing on the risk to the population of squid in shallow enclosed waters, such as Nantucket Sound. He testified that permitting fishing in spawning grounds creates a risk of depletion of the stock of fish, which can happen rapidly. Squid have an average life expectancy of about eighteen months, and the population is subject to considerable seasonal variation. It is therefore difficult to tell whether or not the stock of squid is in imminent danger of depletion from over-fishing.
>
> The number of immature squid that appears in the nets greatly increases after the second week in June. Such squid would otherwise be likely to survive to maturity and spawn the following season.

The district court further found:

> Squid are harvested by dragging large nets through the water. The capacity of a fishing vessel to catch squid is directly related to the size of the net it can drag, which in turn is a function of the horsepower of the vessel's engine. In general, larger vessels have greater horsepower than smaller ones, although this is not necessarily so.

In light of the testimony of record, these factual findings cannot be deemed clearly erroneous, see *Maine v. Taylor, supra,* 477 U.S. at 145, 106 S.Ct. at 2450, and they adequately support the district court's conclusions of law that "the 90–foot length restriction is a proper regulation of the means of catching fish, and is reasonably related to conservation of the fishery." The ninety-foot rule is not "clearly excessive in relation to the putative local benefits." Accordingly, the district court's rejection of Davrod's commerce clause challenge to the rule was warranted.

(3) Equal Protection

■ Given what we have determined with respect to the commerce clause challenge to the ninety-foot rule, the equal protection challenge need not detain us long. Suffice it to note that (1) the rule applies to all fishing vessels, including those engaged in fishing for loligo squid; (2) of the fishing vessels longer than ninety feet in length, far more of them are Massachusetts vessels than out-of-state vessels; (3) the district court found that "[t]here are a number of Massachusetts fishing vessels over 90 feet in length which could be converted to squid fishing;" and (4) the district court further found that "[t]he exception created by the defendants for purse seiners has in fact benefitted out-of-state fishermen." We conclude that the equal protection challenge is unavailing.

(4) Privileges and Immunities [14]

■ Article IV, section 2, clause 1 of the Constitution provides that: "The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." The district court findings canvassed with respect to Davrod's commerce clause and equal protection clause claims make it plain that the Massachusetts length limitation does not differentiate among fishing vessels on the basis of the states in which they are berthed or the states of citizenship, residence or incorporation of the vessels' owners. The regulation "was evidently passed for the preservation of the fish, and makes no discrimination in favor of citizens of Massachusetts and against citizens of other States." *Manchester v. Massachusetts*, 139 U.S. 240, 265, 11 S.Ct. 559, 565, 35 L.Ed. 159 (1891). Any privileges and immunities challenge would be without merit.

(5) Summary

■ In the foregoing portion of this opinion we have addressed the validity of the rule adopted by the Division of Marine

Fisheries in 1985 barring fishing vessels longer than ninety feet from fishing in Massachusetts waters. As applied in 1990 to prevent Davrod's Huntress I, a ninety-foot-six-inch freezer/trawler, from fishing for loligo squid in Nantucket and Vineyard Sounds, the rule was challenged in the district court as preempted by the Magnuson Act and as violative of the commerce clause and the equal protection clause. The district court rejected those challenges. On Davrod's appeal, we have sustained the district court's ruling; and we have also foreclosed any possible challenge predicated on the privileges and immunities clause. In sum, we conclude that the Division's ninety-foot length limitation is free of legal infirmity: it is not preempted by federal legislation and it is not unconstitutional.

B. *The Two–Hundred–and–Fifty Metric Ton Limitation*

We now turn to the second issue presented in this case—the validity of the Division's decision to set a two-hundred-and-fifty metric ton ceiling on the amount of loligo squid Huntress I was authorized to process at sea in the spring of 1991. The ceiling was attached as a condition to Huntress I's at-sea processing permit—a permit which also (1) required the presorting of by-catch, and (2) terminated all at-sea processing as of June 15. The ceiling was found by the district court to be an impermissible burden on commerce. From that ruling the Division has cross-appealed.

(1) Preemption

■ For reasons already discussed in relation to the ninety-foot rule, we conclude that the Magnuson Act not only does not foreclose, but rather that it expressly authorizes, Massachusetts' exercise of regulatory authority over the harvesting and at-sea processing of fish in Nantucket and Vineyard Sounds.

---

**14.** No privileges and immunities claim was tendered in Davrod's initial or amended complaint; nor was such a claim addressed in either of the district court's rulings. Although we are not

clear that such a claim is properly before us, we elect to address the claim because it meshes closely with Davrod's equal protection claim.

(2) Burden on Commerce

 When, in November of 1990, the district court denied Davrod's motion for a preliminary injunction against enforcement of the ninety-foot rule, the district court took occasion to identify "an ambiguity which should be addressed in any further proceedings in this case. Although the regulations by their terms forbid vessels over 90 feet 'to conduct fishing activities' in Massachusetts waters, larger vessels are apparently permitted on a selective basis to act as factory ships only.... The potential for discrimination inherent in the present selective practice ... mandates further examination by the court." 1990 WL 180712

As the 1991 spring loligo squid fishing season approached, the Division focused on the "ambiguity" identified by the district court. In a Memorandum to the Marine Fisheries Advisory Commission ("MFAC" or "the Commission") of March 7, 1991, David E. Pierce of the Division staff first outlined the reasons why the Commission "has been conservative with its decisions to approve at-sea processing operations." App. 637. "By being conservative," the memorandum continued:

the MFAC has been able to prevent unrestricted, intensive fishing operations directed against species, such as squid, in relatively small areas over brief periods of time. The Commission and DMF realize that with many small "fleets" of vessels supplying unrestricted numbers of at-sea processors, we risk especially for squid:

(1) high fishing mortality caused by almost continuous fishing since fishermen no longer need to steam to ports such as New Bedford, Point Judith, and westward;

(2) a shifting and focusing of fishing effort into near-shore waters, such as the sounds, with fishing by day for squid and by night for flounders;

(3) very heavy fishing pressure on spawning grounds during spawning and on nursery grounds;

(4) reduction of the forage base important for species supporting recreational fisheries (such as the party boats and other commercial fisheries);

(5) less product for land-based processors such as those on Martha's Vineyard, New Bedford, Point Judith, and elsewhere;

(6) high by-catch and discard of other important species such as striped bass, shad, and river herring;

(7) increased gear conflicts with pot fishermen; and

(8) potential damage to the bottom.

*Id.* at 637–38. In concluding the memorandum, Mr. Pierce pointed out to the Commission the urgency—much of it, evidently, triggered by this litigation—of developing clear standards for the issuance of at-sea processing permits:

A *major problem* is to determine which operations to approve. Last year we had five applications. Selection was based on past record (e.g., amount of cooperation with DMF). The Commission favored operations which ensured our acquiring all the information and cooperation we stated was necessary for us to effectively monitor the operations. These "criteria" were not listed in regulations. They were DMF recommended criteria to guide the Commission with its review.

We need specific criteria. This need was highlighted during an unsuccessful attempt by a R.I. operation to seek injunctive relief against enforcement of our 90′ vessel size restriction. The plaintiff, who failed to win his case, focused in court on squid and his inability to get a squid at-sea processing permit. The judge's decision noted the lack of specific criteria for review of squid applications. He encouraged us to develop those criteria. The Commission should note that DMF must return to Court this April since the plaintiff is still pursuing his complaint.

By the April Commission meeting, we need criteria to decide: (1) the amount of squid to allocate; (2) how many operations to approve; and (3) which operations to approve. A public hearing to hear and review the applications has

been scheduled for March 20. This year we have three applications: R & R Fishing Corp. from N.Y., Atlantic Trawlers, Inc. from Maine, and Deep Sea Fish from R.I.

*Id.* at 638 (emphasis in original).

On April 15, 1991, following the public hearing, Mr. Pierce sent a further memorandum to the Commission. Pertinent portions of the memorandum follow:

We went to public hearing with two alternatives (A and B) for a determination of the amount of squid to allocate for this spring's at-sea processors. Alternative B was in keeping with a philosophy, espoused by past applicants, that at-sea processors should only come into the sounds to take the "surplus"—the amount in excess of what shoreside processors can handle in a good year. During poor or fair years, shoreside processors claim they can handle all available squid.

\* \* \* \* \* \*

While we are tempted to recommend a continuation of our philosophy that shoreside processors should not be disadvantaged and that the "surplus" squid should be allocated to at-sea processors, we recognize the merits of at-sea processing (e.g., alternate markets for fishermen and data gathering). *Therefore, we recommend a modified "Alternative A": i.e., increased allocation for fair, good, and excellent categories.* When the Director projects that the fishery will be:

\* poor, then no at-sea processing operations will be permitted;

\* fair, then 500 mt (about 1.1 million pounds) will be allocated;

\* good, then 750 mt (about 1.65 million pounds) will be allocated;

\* excellent, then 1,000 mt (about 2.2 million pounds) will be allocated.

In all instances important restrictions will continue such as limits on the number of boats and the discard percentage of small squid triggering a termination of all at-sea processing operations.

*Based on the above information and positions, especially the expectation of a FAIR fishery, we recommend that 500 mt be allocated for this spring.*

**Number of operations to approve**

We recommend that only two operations per fishing season be approved due to DMF's limited sea sampling and monitoring capabilities. Monitoring is very important since we need to be aware of the catch of small squid (1990 early cohort) and finfish by-catch (e.g., striped bass).

The number of operations to be approved also should be influenced by the amount of squid available for allocation and the minimum amount of allocation that makes an operation viable. For example, assuming that 250 mt makes for a viable operation, since this spring's fishery is expected to be "fair", 500 mt should be split between two applicants. This assumes the Commission decides that two applicants should get approval. If only one applicant meets our criteria (see public hearing handout), then the 500 mt should be allocated to that one applicant.

We recommend that 250 mt be the minimum amount of allocation for an at-sea processing operation. The applicants on their returned questionnaires and at the hearing could not give us clear guidance as to what makes an operation viable. Deep Sea Fish could not give us an answer. Mr. Dowdell stated, "The minimum amount of Loligo squid allocation needed to make our operation viable is a tough question due to the variables that are beyond our control. These variables being the size of the Loligo squid caught, the market conditions at the time, the price of fuel, etc."

Mr. Love of Atlantic Trawlers Fishing, Inc., stated that 500 mt was needed. However, at the hearing, in response to fishermen's urging, he acknowledged that 250 mt would be enough of an incentive for his company to process at-sea.

Since Deep Sea Fish could not give us any guidance and since Atlantic Trawlers indicated that 250 mt would be acceptable, we conclude that 250 mt should be the minimum amount for a squid at-sea processing operation.

**Applications to approve and the amount per operation for 1991**

We recommend the Commission approve Atlantic Trawlers Fishing Inc. and Deep Sea Fish with 250 mt for each operation. Both operations' approval, however, is subject to important stipulations (see below). If either operation refuses its allocation, we recommend the other operation receive that allocation for a total of 500 mt. We recommend that Ruggerio Seafood be denied.

App. 821–23 (emphasis in original).

As recommended, at-sea processing permits were authorized for: (1) Atlantic Trawlers, and (2) Deep Sea Fish, Davrod's subsidiary, for Huntress I. The third applicant, Ruggiero Seafood, which did not complete the Division's questionnaire and whose managing official did not appear at the public hearing, was turned down. The permits ran until June 15, 1991. The principal permit conditions permit were: (1) a two-hundred-and-fifty metric ton (551,000 pounds) limit on the loligo squid to be processed; and (2) a requirement that "[a]ll catch—be sorted before squid can be transferred to the at-sea processing vessel," in order to prevent the killing of by-catch. Davrod accepted the Huntress I permit under protest and returned to the district court. The district court, in its opinion of June 10, 1991, concluded that the two-hundred-and-fifty metric ton limitation was an impermissible burden on commerce.[15]

In challenging the district court's ruling, the Division contends that conservation, not protection of shore-based processors, was the primary focus of the two-hundred-and-fifty metric ton limitation on Huntress I's 1991 at-sea processing. While there is much evidence of record tending to establish the Division's conservation concerns, there is also substantial evidence of the Division's interest in protecting land-based processors. Thus, the Pierce March 7, 1991 Memorandum to the Commission listed eight risks "especially for squid" arising from "many small 'fleets' of vessels supplying unrestricted numbers of at-sea processors;" the fifth risk was "less prod-

uct for land-based processors such as those on Martha's Vineyard, New Bedford, Point Judith, and elsewhere."

The Division contends that the protection of shore-based processors is, in any event, a legitimate state interest:

The fishing industry needs processing capacity to handle species other than the squid caught in the spring. The viability of shore-based processors is therefore critical to meet the need to process other species than squid, such as cod, haddock, and other commercially viable species. The at-sea processors's concentration on the squid resources at peak season weakens the position of land-based processors. The Commerce Clause does not prohibit a state from taking steps to ensure that the entire industry does not suffer from the efforts of those who would skim the cream of the fishery.

Brief of Defendants–Appellees and Cross–Appellants, p. 39.

We do not doubt that the state has a legitimate interest in protecting enterprises that are in jeopardy. However, the evidence adduced by the Division to demonstrate the nexus between the ceiling on at-sea processing and preserving "[t]he viability of shore-based processors" was very modest indeed. So much so that the district court observed:

Other than the unsupported opinion of a marine biologist employed by the defendants, there is no evidence that loss of the squid processing business would drive so many land based processors out of business that there would be no one left to process other species of fish after the at-sea processors moved on to other fisheries. The evidence is insufficient for me to make a finding on this point.

The district court, noting the Division's unwillingness to couple the ceiling on at-sea processing of squid with such other restraints as (1) a ceiling on shore-based processing, (2) an overall ceiling on squid fishing, or (3) an abbreviation of the squid fishing season, concluded that the at-sea processing ceiling "appears to be solely

---

**15.** See the excerpt from the district court's opinion quoted in the text at note *4, supra.*

related to the protection of shore based processors." In support of this conclusion the district court cited what it termed "analogous" cases: *Foster–Fountain Packing Co. v. Haydel*, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928); *Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948); and *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). As the cited cases attest, "the Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." *Id.* at 145, 90 S.Ct. at 849.

If we were satisfied that the record substantially supports the inference that the two-hundred-and-fifty metric ton ceiling is "solely" calculated to steer squid processing away from efficient out-of-state freezer/trawlers and towards Massachusetts shore-based processors, then, in our judgment, "the burden [would fall] on the State to demonstrate both that the [ceiling] 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Maine v. Taylor, supra,* 477 U.S. at 138, 106 S.Ct. at 2447.[16] But the inference seems to us open to question in at least two respects:

*First:* The record appears to show that the Division's concern for shore-based processors was not confined to Massachusetts enterprises. Thus, the Pierce March 7, 1991 memorandum refers to "land-based processors such as those on Martha's Vineyard, New Bedford, *Point Judith, and elsewhere.*" (emphasis added). Moreover, the district court itself stated that: "The protection provided to land-based processors is not designed to favor just Massachusetts residents but all land-based processors which serve Massachusetts fisheries, which include processors in Rhode Island and New Jersey." We recognize the conjectural possibility that a program which is fundamentally parochial in its orientation may—whether as camouflage or otherwise—shower incidental benefits on out-of-state enterprises. But conjecture—either way—is not an adequate predicate for adjudication. Before a state regulatory requirement is overturned, or sustained, further analysis is in order.

*Second:* We are troubled by the fact that the district court has made no finding on whether the Division could reasonably have concluded that limitations on at-sea processing of squid are needed in order to insure that shore-based processors will remain in business to handle fish species other than squid. As we have noted, the evidence bearing on this point is, as the district court found it to be, scant. But we do not think a non-finding suffices to indict, or validate, the Division's determination.[17]

Accordingly, we conclude that the district court's injunction against enforcement of "any restriction on the amount of loligo squid which may be processed annually by at-sea processors" should be vacated and the cause remanded to the district court for further proceedings.[18]

16. The district court's findings suggest the difficulty of making such a demonstration.

17. A third issue may also require further examination. The district court characterized "the restriction on at-sea processing" as one that "burdens interstate and foreign commerce by interfering with the quality of the product"—an apparent acceptance of the view that squid processed at sea are fresher and command a higher price "in the substantial foreign market (principally Italy, Spain, and Japan)" than shore-processed squid. See note 4, *supra.* But it is not clear from the district court's opinion whether the court, in emphasizing the freshness of at-sea processed squid, factored in the delay in at-sea processing necessitated by the Division's requirement that the catch be pre-sorted before transfer from fishing vessels to at-sea processing vessels—a requirement not challenged before this court.

18. Notwithstanding that we do not feel, in the present posture of the case, that the district court's injunction can be sustained—or overturned—on burden-on-commerce grounds, it is as a conceptual matter possible that the injunction could be sustained on the basis of a determination by this court that the ceiling on the amount of squid to be processed at sea contravenes the equal protection clause or the privileges and immunities clause. But, for two reasons, we think it would not be sensible for us to pursue such questions at this time. *First,* the district court—quite properly—limited its findings and discussion relating to the constitutionality of the at-sea processing ceiling to the commerce clause issue that the district court found

## Conclusion

The district court's denial of an injunction against enforcement by the Division of its ninety-foot rule is affirmed. The district court's order granting an injunction against enforcement of "any restriction on the amount of loligo squid which may be processed annually by at-sea processors" is vacated and the cause remanded to the district court for further proceedings consistent with this opinion. Costs to defendants.

FRANK M. COFFIN, Senior Circuit Judge (concurring in part and dissenting in part).

While agreeing with the results reached by my brethren on the equal protection, privileges and immunities and preemption questions, I respectfully disagree with their Commerce Clause analysis. I would neither uphold the 90–foot limitation nor vacate the district court's decision on the 250–metric–ton rule.

### The 90–Foot Rule

I am unable to conclude that the 90–foot rule burdens interstate commerce only "incidentally." An array of evidence presented in the district court suggests the rule affirmatively discriminates in practical effect against out-of-state concerns.

As the majority points out, the vessel length limitation, as written, applies to Massachusetts and non-Massachusetts vessels, alike. However, there is persuasive evidence of its having a discriminatory effect on a particular class of out-of-state interests—squid freezer-trawlers such as plaintiffs' *Huntress I.* It is undisputed that the rule effectively bars all freezer-trawlers from squid fishing in Massachu-

setts waters. David Pierce, a senior fisheries manager for the state, offered uncontradicted testimony that there are no squid freezer-trawlers less than ninety feet long in the region. Moreover, it appears that there are no Massachusetts freezer-trawlers of any size.[19] To the extent the rule bars squid freezer-trawlers from Massachusetts waters, it manifestly discriminates against out-of-state interests.

Focusing on the beneficiaries of the 90–foot rule, rather than those burdened by it, likewise suggests discriminatory effect. Plaintiffs contend that the length limitation was enacted, in part, to protect Massachusetts's shore-based squid processors from out-of-state competition. Since freezer-trawlers process their own catch, permitting such vessels to fish for squid will divert revenues from Massachusetts shore-based processors to out-of-state interests. Granted, not all shore-based squid processors are Massachusetts' operations. It appears that at least one Rhode Island processor currently benefits from the vessel length limitation. Uncontradicted testimony in the district court, however, suggests that three of the four largest shore-based processors are, indeed, Massachusetts outfits. Thus, while the 90–foot rule does not benefit Massachusetts interests exclusively, it appears to do so disproportionately.[20]

The district court's conclusion of no discriminatory effect (and, to some extent, the majority's as well) rests in part upon a determination that the rule would burden Massachusetts freezer-trawlers longer than ninety feet if there were any. When analyzing the practical effect of a regulation our focus ought to be on its actual as

dispositive. *Second,* we think that the additional inquiry to be pursued on remand with respect to the commerce clause issue is likely to shed further light on the other constitutional claims in the event that they need to be addressed by the district court or even, at some further phase of this litigation, by this court.

**19.** All agree there are no Massachusetts freezer trawlers longer than ninety feet. David Pierce's testimony that there are no freezer-trawlers less than ninety feet long in the area thus suggests there are no Massachusetts freezer-trawlers.

David Dowell, owner of Davrod Corporation, offered explicit testimony to this effect.

**20.** The record contains no evidence of the rule's impact on non-Massachusetts boats *less* than 90 feet long. The fact that both Massachusetts and non-Massachusetts fishing boats shorter than 90 feet may benefit from the rule, however, does not alter its net discriminatory effect on out-of-state interests. The same is true of defendant's contention that the exception for purse seiners benefits more out-of-state than in-state boats.

opposed to its theoretical impact. That there are no Massachusetts squid freezer-trawlers longer than ninety feet, nor, apparently, were there any at the time the regulation was promulgated, tends to highlight, rather than undercut, the discriminatory nature of the statute.

To be sure, the length limitation is neutral on its face; it does not single out non-Massachusetts freezer-trawlers for exclusion. Defendant produced a computer print-out suggesting that of the one hundred or so fishing boats longer than ninety feet licensed by the Massachusetts Division of Marine Fisheries, the majority are berthed in Massachusetts.[21] On close analysis, though, this evidence proves exceedingly slight. Testimony offered in conjunction with the print-out suggests that the Massachusetts boats supposedly affected by the rule generally fish off shore in federal rather than Massachusetts waters. Defendant's star witness, David Pierce, explained that the printout (entitled "offshore lobster permits") identifies vessels licensed by the state to catch lobsters "in offshore grounds"—in "federal," as opposed to "inland," waters.

I suspect the 90–foot limitation affects Massachusetts boats in name only.[22] There was no testimony at trial concerning any Massachusetts vessel adversely affected by the rule.[23] Nor has any Massachusetts concern joined plaintiffs in challenging it. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 473, 101 S.Ct. 715, 728, 66 L.Ed.2d 659 (1981).[24] This silence is all the more deafening in light of the ruckus raised by Massachusetts fishermen in response to a proposed 65–foot vessel limitation.[25] That this proposal was rejected in favor of the 90–foot one, with apparently no such hue and cry, casts further doubt as to the evenhandedness of the regulation.

In sum the record suggests: (1) the 90–foot rule adversely affects out-of-state interests; (2) it has no such impact on in-state ones; and (3) it disproportionately benefits local interests. On such a record, to label the effect on interstate commerce "incidental" seems to me to create too wide an escape hatch from the Commerce Clause. I would find affirmative discriminatory effect.[26]

21. Defendant also submitted a list of fishing vessels world-wide published in 1986, indicating a number of boats in excess of 90 feet berthed in Massachusetts. Its incompleteness, however, bars any useful conclusion being drawn from it.

22. There is some evidence for this proposition. In a 1985 intra-office memorandum outlining the pros and cons of the proposed 90–foot rule, defendant noted, in the rule's favor, "that few vessels greater than 90 feet ... habitually fish Massachusetts waters." David Pierce twice corroborated this statement before the district court.

23. A Massachusetts fisherman called by plaintiffs testified that he had declined to purchase a 95 foot vessel in light of the limitation. This lonely, anecdotal suggestion of actual adverse effect, however, does not move me. Moreover, the relevant inquiry in this case, it seems to me, concerns not such lost opportunities, but, rather, the number of extant boats, both in- and out-of-state, actually barred from fishing in Massachusetts waters under the rule.

24. There the Court upheld against a Commerce Clause attack a state regulation barring the sale of milk in Minnesota in non-reusable, non-re-

turnable (i.e., plastic) containers. The Court found no evidence that Minnesota pulp and paper firms would gain and non-Minnesota firms lose, on balance, under the statute. In so concluding, it relied, in part, upon the fact that two of the dairies challenging the statute were in-state firms. "The existence of major in-state interests adversely affected by the Act is a powerful safeguard against legislative abuse," it reasoned. 449 U.S. at 473 n. 17, 101 S.Ct. at 728 n. 17. No such safeguard is present in this case.

25. The record contains letters from Massachusetts owners of 65 to 70 foot fishing vessels to defendant objecting to the proposed 65–foot rule. There are no such letters concerning Massachusetts boats 90 feet or longer.

26. I also wish to express my disagreement with the majority's view of *Atlantic Prince v. Jorling*, 710 F.Supp. 893 (E.D.N.Y.1989). I find that case indistinguishable in any meaningful way from the one before us. In *Atlantic Prince*, the court found New York's 90–foot vessel length limitation to discriminate in practical effect against out-of-state interests. There, as here, the regulation was neutral on its face, but adversely affected out-of-state boats ("almost exclusively"). That there was also evidence of discriminatory

This determination, of course, does not settle matters. "[O]nce a state law is shown to discriminate against interstate commerce 'either on its face or in practical effect,' the burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979)). The district court concluded that the 90–foot rule furthers a legitimate local purpose (squid conservation) and that "other conservation means would not impose a substantially lighter burden on interstate commerce."

I take no issue with the first of the district court's findings. Indeed, I agree wholeheartedly with it. The second, however, I find neither supported nor refuted by the record. (I therefore disagree with the majority's affirmance of it *supra*, at 791.) There was a good deal of testimony in the district court concerning the ineffectiveness of certain alternatives to the 90–foot rule. Defendant explained the drawbacks of regulations limiting the horsepower, door-size, gear-type, net/mesh-size, and total catch of squid fishing vessels. There was also some discussion of the difficulty of enforcing night and regional closures of overfished grounds. Doubtless the district court was well within its discretion to credit this testimony. I, however, am aware of no evidence that Massachusetts's conservationist goals could not be served as well by shortening the squid fishing season for all vessels.[27] This option, deemed attractive and available by the district court in its ruling on the 250–metric–ton limitation,

would appear no less so in the context of the 90–foot rule.

In light of my conclusion of affirmative discriminatory effect, I would vacate and remand this branch of the case for further factfinding under *Taylor*. Specifically, I would ask the court to address the feasibility of replacing the 90–foot rule with a shortened squid fishing season.[28]

### The 250–Metric–Ton Ceiling

The district court appears to have decided that the quantity limitation in plaintiffs' squid processing permit affirmatively discriminates against out of state interests, that it does not further either of the local purposes advanced by the state, and that there is an equally effective, non-discriminatory method of conserving squid stocks. Because I find these conclusions supported by the record I would affirm rather than vacate the district court's decision.

#### Discriminatory Effect

It is undisputed that the 250–metric–ton ceiling on squid processing burdens out-of-state interests exclusively. Additional factfinding, as the majority proposes, might disclose some number of non-Massachusetts shore-based processors that benefit, along with Massachusetts ones, from the cap on at-sea processing. The record, however, presently indicates that three of the four largest shore-based processors in the region are Massachusetts ones. It thus permits the inference that the limitation discriminates against out-of-state interests in favor of local ones.

#### Legitimate Local Purpose and Alternative Non–Discriminatory Means

The evidence linking the ceiling on at-sea processing to a conservationist purpose was less than compelling. Daniel McKiernan, one of the state's marine biologists,

---

intent in *Atlantic Prince* does not blunt the force of these similarities.

**27.** Dr. David Murawski, a marine biologist employed by the National Marine Fisheries Service, offered uncontradicted testimony that restrictions upon "days fished" are among "[t]he most effective" and easily enforced conservationist measures. In response to petitioner's query whether "area and seasonal [closures] ... are easier to monitor" than the 90–foot rule,

Daniel McKiernan, a marine biologist for the state, could only state that it was "difficult to say...."

**28.** I recommend further proceedings, rather than outright reversal because, as far as I can tell, the court has not yet analyzed the evidence of alternative non-discriminatory means through the prism of *defendant*'s burden of proof. *See Taylor*, 477 U.S. at 138, 106 S.Ct. at 2447.

agreed unequivocally that the "primary purpose" of the limitation is "to protect the shore-based processors." As for the argument that the 250–metric–ton rule is necessary to ensure that enough shore-based operations remain economically viable to process Massachusetts fish species other than squid, the district court found "no evidence" (beyond "unsupported opinion") to substantiate it. That the court then deemed the record "insufficient" to make a finding on this point does not trigger a need for further factfinding. Under *Taylor*, defendant has the burden of proving local legitimate purpose. 477 U.S. at 138, 106 S.Ct. at 2447. I am persuaded he failed to do so.

Finally, even were I to find the court erred in rejecting the proffered local purposes, I would uphold its ultimate ruling since defendant has not proven the unavailability of non-discriminatory methods of conserving squid or saving Massachusetts's fish processing industry. My review of the record discloses no reason why a shortened squid fishing season combined with a requirement that at-sea processors accept only pre-sorted catch would not work as well as the quantity quota.